UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Graham Shea, DDS, | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-CV-00830-LY |
| | ) | |
| Management and Training Corporation, | ) | |
|    *Defendant* | | |

# FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

In this suit, Graham Shea, DDS, asserts causes of action against Management and Training Corporation ("MTC"). Specifically, Shea asserts that MTC, through its agents and employees, retaliated against him in the form of termination of his employment simply because of his insistence that MTC follow its contractual and moral duties to provide a basic level of oral care to the students it serves through its contract with the Department of Labor and the Job Corps Program.

On numerous occasions, Shea implored his supervisors to purchase the equipment necessary for him to uphold his ethical and contractual duties to provide a basic level of dental care to the students at Gary Job Corps Center in San Marcos and each time his requests were met with silence and indifference. Finally, after being ignored for months in his pleas to his managers and supervisors, Shea informed the Regional Office Center Assessment inspector of the equipment deficiencies in the dental clinic, after being told to keep quiet on such matters.

Instead of viewing Dr. Shea as a partner in their endeavor to provide quality dental care to the students they were contracted to care for, MTC and their agents decided to view Dr. Shea as a problem in need of correction. On January 13, 2017, MTC solved their problem, not by getting

Dr. Shea the equipment he needed to do his job, but instead by terminating his employment in retaliation for his failure to continue to be silent on these equipment failures.

## I. PARTIES

1. Plaintiff Dr. Shea is an individual residing in the City of San Marcos, Hays County, Texas. His telephone number is 503.318.1996 and email address is gckshea@gmail.com.

2. MTC is a Delaware corporation doing business in the State of Texas with its principal office located at 500 N. Marketplace Drive, Centerville, Utah 84014 (801.693.2600 (phone)) and a regional office located at 2995 Dawn Drive, Suite 106, Georgetown, Texas 78628 (512.868.2429 (phone)). MTC may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## II. JURISDICTION AND VENUE

### A. Federal Question Jurisdiction

3. Pursuant to 28 U.S.C. section 1331, this Court has jurisdiction over all matters presented in this case. Specifically, this case concerns MTC's violation of federal statute 41 U.S.C. section 4712, which provides that, "…an employee of a federal contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule or regulation related to a federal contract or grant."

4. Dr. Shea has exhausted all of his administrative remedies in compliance with 41 U.S.C. section 4712(c)(2), and, on June 21, 2018, he received an Order Denying Relief from the Department of Labor's Assistant Secretary, Bryan Slater. Pursuant to 41 U.S.C. section

4712(c)(2), Dr. Shea has brought this *de novo* action at law and equity against the contractor to seek compensatory damages and other relief available under this section in the appropriate District Court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

   5.  Pursuant to 28 U.S.C. section 1391(b), venue is proper in this Court because it is the federal judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.  Specifically, all events giving rise to the claim occurred at the Gary Job Corps Center located in the City of San Marcos, Hays County, Texas.

### III.  FACTUAL BACKGROUND

**A.**  **The Parties**

   6.  Dr. Shea has been a practicing dentist since 1991.  He attended the University of Nebraska's College of Dentistry and graduated in May 1990.  In August 2014, Dr. Shea served as a clinical instructor at the Portland Community College and he saw the Job Corps position as an opportunity to further his desire to practice dentistry with a focus on the educational aspects of proper oral care and wellness to students who likely had never had dental services or education. MTC is a national corporation which administers and manages various federal facilities across the country.  Specifically, MTC operates and manages Job Corps centers in Arizona, Connecticut, Delaware, Georgia, Hawaii, Illinois, Kansas, Kentucky, Louisiana, Minnesota, Nevada, New Jersey, New York, Ohio, Oregon, Pennsylvania, Utah, and Wyoming.  MTC also operates and manages many private prisons through out the country.  The Contract serving as the basis for this complaint incorporates the Procedure and Rules Handbook ("PRH") into its terms, and the PRH clearly states that as part of the health and wellness program of Job Corps, all students must undergo a dental readiness exam and all facilities must have the ability to take and produce bite-wing x-rays.

**B.   Dr. Shea Begins Work at GJCC and Immediately Identifies Serious Workplace Issues.**

7. In 2015, Dr. Shea was approached by a career placement advisor with an opportunity to become the Center Dentist for a Job Corps center located in San Marcos, Texas. After completing MTC's standard review process, Dr. Shea's experience, training ,and credentials were determined to be of the caliber MTC needed for their Center Dentist at Gary Job Corps Center (the "GJCC") and he was hired.

8. Shea reported for his first day of work on July 18, 2016. On August 1, 2016, less than 15 days after arriving at GJCC, Dr. Shea had already uncovered serious deficiencies in the dental diagnostic equipment at the facility. Specifically, Shea discovered that the dental clinic at GJCC did not possess the capability to produce bite-wing x-rays necessary to properly diagnose and treat many of the conditions presented by GJCC students. Dr. Shea informed the GJCC's Health and Wellness Administrator, Brenda Brooks, that without this type of equipment he was unable to properly diagnose decay between teeth and bony pathologies. In addition, without such a machine, his ability to detect and treat root canals, cysts, and tumors would be extremely compromised.

9. In response, Brooks told Dr. Shea that he must "follow the chain of command" at GJCC and should he require additional equipment, have requests or concerns about the facility that he must communicate with her to address any of these issues. However, Brooks systematically ignored his legitimate requests for equipment necessary to bring the clinic into line with its contractual obligations. As explained more fully below, it became extremely clear that Brooks was intent on ensuring that no requests or concerns were actually allowed to flow up the "chain of command."

10. In rejecting Dr. Shea's request for adequate equipment, MTC claimed that it was unnecessary because Dr. Shea's predecessor was "okay" working with the existing equipment. This predecessor had purchased the existing panoramic x-ray for the clinic and was described by MTC employees as "old school."

11. Importantly, in an interview conducted as part of a later investigation by the Department of Labor's Office of Inspector General, MTC's Sheryl Cheek, RN, admitted that the dental clinic needed to be updated. She further stated that Dr. Shea's predecessor failed in his duties to keep the clinic updated and she described him being merely a "country dentist" who tried to repair equipment himself. Unfortunately, his attempts at repair were inadequate to maintain the panoramic x-ray machine, which was inoperable for at least 10 weeks of the two years it had been in place at the clinic. And, even when the machine was operable state it was insufficient to diagnose and treat more advanced pathologies. Dr. Shea's concern with the x-ray equipment was the fact that it was inadequate to meet the requirements for student's dental examinations. Despite the gravity of these issues, Brenda Brooks and MTC simply ignored his pleas to obtain the equipment necessary to bring GJCC into compliance with the requirements of the contract and the Policy and Requirements Handbook (PRH) 6.10, R2 (c).

## C. GJCC Recognizes Dr. Shea Is Doing an Excellent Job

12. Dr. Shea received a glowing performance review on August 31, 2016 despite his brief tenure at GJCC. He was encouraged to continue to advocate for the oral health needs of the students. Believing he simply needed to continue to ask for the equipment he needed, Dr. Shea sent another request for equipment in a proposal to Brooks on September 2, 2016 requesting the Intraoral, or bite-wing, x-ray equipment. Again, Dr. Shea explained that without this piece of equipment he was unable to perform important therapies, including root canals, could not

accurately or properly diagnose basic dental decay or periapical abscesses, among other dental pathologies. This request was met with indifference and silence on the part of GJCC.

### D. Shea Is Forced to Take Leave Due to a Serious Medical Condition

13.     In late September, Dr. Shea experienced a painful episode stemming from multiple bilateral inguinal hernias, a condition he had dealt with for almost a decade. Dr. Shea immediately sought an appointment with his primary physician and received a referral to a surgeon two days later. Upon meeting with the surgeon on September 29, 2016, Dr. Shea was informed this surgeon was not in his medical plan and had to seek another surgeon. After reaching out to his insurer, Dr. Shea was directed to a surgeon in San Antonio and, because his hernia was not deemed to be an emergency, he was unable to meet with the surgeon until October 6, 2016. While awaiting his surgical consult, Dr. Shea received a clearance letter to accommodate his days off work to avoid sitting or standing for long periods to mitigate the hernia from worsening.

14.     Dr. Shea finally underwent surgery on October 11, 2016, and Dr. Shea took medical leave the day before for pre-op preparations. After the surgery, Dr. Shea was granted a one-month medical leave with permission to return to work with restricted duties upon his return. Between October 11 and October 25, Dr. Shea was unable to work due to post-surgery recovery. Dr. Shea returned to work on October 26, 2016 and worked intermittently for the following weeks as he continued his recovery. Then in mid-November, Dr. Shea experienced post-surgical complications and had to return to San Antonio several times for medical care. Despite the medical challenges he faced, Dr. Shea was Dr. Shea was back working full time by December 1, 2016. Importantly, in her later OIG interview, Brooks admitted that the majority of Dr. Shea's absences were directly related to his documented medical and surgical recovery.

### E. Dr. Shea Makes a Third Request for Necessary Equipment.

15. On November 3, 2016, Dr. Shea made a third attempt to secure equipment necessary for MTC to meet its contractual obligations and Dr. Shea to meet his professional obligations as a licensed dentist. The request contained two different documents: The first was the equipment proposal for the intraoral x-ray machine Dr. Shea had repeatedly requested; the second was a brief memorandum detailing PRH requirements, including that bitewing x-rays are a required component of the elective oral examination and the recommendations of best practices by the ADA and Texas Dental Board. Again, no response or action was taken on the part of the MTC wellness administrator after receiving Dr. Shea's third request.

16. On December 12, 2016, Dr. Shea sent an email to Drs. Kevin Avery and Pamela Alston, the two dentists responsible for overseeing the health and wellness program for Job Corps throughout the country to obtain guidance on how to deal with the equipment and care issues he was experiencing at GJCC. Both were employees of Humanitas, the company responsible for providing oversight of the Job Corps Health and Wellness Programs. In his email, Dr. Shea asked whether Job Corps had specific standard operating procedures for addressing dental patients with urgent/emergent needs beyond the capabilities of a general dentist or the facility's ability to treat. Dr. Alston responded that PRH-6.10, R2 (e) required each facility to have a written referral plan or agreement with a community facility for emergent or urgent conditions beyond conditions treatable by a general dentist and that it was the responsibility of the center dentist and health and wellness admin to create such a plan or arrangement. Dr. Alston offered to raise the topic in an upcoming teleconference with the other center dentists around the country.

F. **GJCC Imposes a Gag Order on Dr. Shea Barring Him from Communicating with Other Job Corps Center Dentists.**

17. On December 15, 2016, after the teleconference with the other Job Corps center dentists, Dr. Shea had a disturbing interaction with Brooks in which she abruptly instructed Dr.

7

*Shea v. MTC: Plaintiff's First Amended Complaint*

Shea not to communicate with any non-MTC employees. Suspiciously, this dictate came immediately after Dr. Shea requested contact information for the other Job Corps dental professionals to discuss how they handled their referrals for emergent/urgent oral care needs and to be able to have a resource when he had dental practice-related questions. Instead of simply reminding Dr. Shea of his obligation not to disclose proprietary information related to MTC's practices, Brooks instituted a complete gag order to prevent Shea from communicating with anyone outside of MTC. Although he had ostensibly been encouraged to actively participate in these telephone conferences, now, Brooks told him that he may listen in on the conferences but, was prohibited from speaking![1] Dr. Shea memorialized this interaction with Brooks in an email that same day to Dr. Pamela Alston.

18. In response, Dr. Alston expressed her dismay at the state of affairs at GJCC and her concern that the remarks by Brooks about discouraging any communication between Dr. Shea and his other Job Corps peers would undermine his ability to provide the best care to the students. Dr. Alston stated "You (Dr. Shea) are an excellent dentist and are passionate about your work...Precisely because you are outraged about the Wellness Center Administrator's remarks is the reason why you are so good for Job Corps."

19. On December 28, 2016, Dr. Shea and Dr. Alston communicated about Brooks' order that he not voice concerns about any of the deficiencies he had discovered at GJCC. Specifically, he had been attempting to bring GJCC into compliance with PRH requirements regarding the need to perform intraoral x-rays via bitewing style x-ray, the complete absence of any referral plan for emergent health issues, and to generally raise the standard of care to

---

[1] This gag order was confirmed by the Office of Inspector General's investigation into GJCC. In that investigation, an MTC employee corroborated that Brooks had prohibited Dr. Shea from speaking to other center dentists throughout the Job Corps community.

8

*Shea v. MTC: Plaintiff's First Amended Complaint*

professionally acceptable levels at GJCC. Dr. shea's interactions with Brooks followed a standard script – Brooks would state that Dr. Shea was an employee of MTC, she was his superior, and would adhere to her rules. Period. She explained that because there were politics involved, certain protocols had to be followed. Dr. Shea communicated his frustrations with the inability to speak to anyone outside of MTC to Dr. Alston, but he did not want to disclose the substance of his concerns before speaking with Center Director, Lonnie Hall.

### G.     Dr. Shea Discloses PRH and Contractual Violations to the Regional Office Inspector

20.     Having been ignored in his pleas for equipment to bring the dental clinic in line with PRH requirements and professional dental ethics and establish an SOP for emergency referrals, Dr. Shea saw his last opportunity to bring these gross deficiencies to the attention of someone with the ability to change the status quo in his upcoming meeting for the Regional Office Center Assessment (ROCA) on January 10, 2017. Pursuant to his upcoming meeting with the assessor/inspector, Dr. Shea completed a Pre-Program Compliance Assessment Questionnaire, a document designed to verify and clarify compliance with PRH requirements and applicable laws. In answering the questionnaire, Dr. Shea identified the fact that the clinic lacked the necessary x-ray capabilities to perform basic oral care, including but, not limited to, root canal therapy or replace missing upper anterior teeth with a removable prosthesis.

21.     At about the same time, Brooks issued a verbal warning to Dr. Shea claiming he was excessively absent from his post between July and December 2016. Brooks did this despite being fully aware that Dr. Shea had been recovering from post-surgical complications that forced him to miss work between October and November 2016. Other than his medically necessary absences, Shea had been a model employee with few absences. Rather than work to address the

serious deficiencies identified by Dr. Shea and improve the standard of care at GJCC, Brooks set about attempting to create a pretext to terminate Dr. Shea.

22.     On January 10, 2017, Dr. Shea was scheduled to meet with the Job Corps assessor/inspector conducting the audit of GJCC's compliance with PRH Health and Wellness requirements. Shortly before the ROCA was conducted, Dr. Shea was pulled aside by the Nursing Supervisor, Sheryl Cheek, RN, and told to watch what he said to the inspector and to avoid negative comments about GJCC, its facilities, or operations. She explained that in the past, nursing staff were asked by the inspector if the staff needed any particular equipment or supplies to better perform their jobs. Invariably, when those disclosures occurred, they resulted in a demerit against GJCC and were reported to the Administrative staff.[2] In short, Dr. Shea was told to keep his mouth shut regarding equipment or facility shortcomings because it would result in consequences for the GJCC administrative staff, MTC, and him, personally.[3]

---

[2] These facts were confirmed by Cheek in her interview with the Department of Labor's OIG. In particular, she admitted to coaching employees, including Dr. Shea, not to engage in conversations with ROCA inspectors during their inspection. She further admitted that management asked the employees to only answer the question they are asked and not to volunteer any information, regardless of its importance. As justification for the restrictions placed on employees during the ROCA inspection, Cheek stated that employees do not understand the repercussions to GJCC if it received a low score – whether deserved or not – and believed that any concerns GJCC employees had would be addressed solely by management.

[3] In her interview with Department of Labor's OIG, Brooks admitted to telling employees not to engage in conversations with the ROCA investigators. Specifically, she admitted to ordering employees not to identify GJCC's deficiencies to the inspectors unless forced to do so in response to a direct question from the investigators. Brooks also admitted in her interview that after a ROCA inspection was complete, she would ask the employees to detail exactly what had been asked of them and how they responded. And, at the conclusion of the inspection, she would discuss the areas of concern at the clinic with the inspectors and the inspectors would mention the name of the employee who disclosed the issues.

23. Cheek's instruction to be silent was untimely as Dr. Shea had already disclosed the deficiencies he had been attempting to remedy in his Pre-Assessment report. Therefore, when the inspector arrived she was fully aware and actively investigated the issues he raised, including why Dr. Shea was not performing root canals and why elective oral exams were incomplete as a result of the lack of diagnostic x-ray equipment. The investigator was also aware of Dr. Shea's efforts to bring GJCC into compliance with state and federal law and the PRH rules.

24. The disclosures related to the lack of proper dental x-ray equipment resulted in GJCC and MTC being cited in the January 2017 inspection for failing to have the proper x-ray equipment necessary to provide treatment to students. The bite-wing x-ray machine was estimated to cost $28,000.00. No request for additional funding had ever been made by MTC to purchase the x-ray equipment and but for the negative marks on the ROCA inspection, it is unlikely one ever would be.

**F.     Dr. Shea Is Terminated for Making Protected Disclosures.**

25. On January 13, 2017, while performing a dental exam, Dr. Shea was summoned to meet with Director Hall and Brooks about Dr. Shea's prior requests to contact other Job Corps dentists about various dental practice issues. Hall and Brooks denied Dr. Shea's requests to communicate with other dentists outside the GJCC facility. Hall stated that dental practice at GJCC was not like in private practice and that there were real world consequences to not towing the line for MTC when they are engaged in a for-profit enterprise. After this meeting adjourned, Brooks brought Dr. Shea to the HR office next door where he was informed by HR and Brooks that MTC would not be renewing his contract after the 180-day probationary period and he was being terminated effective immediately. No reason was given for the termination. In fact, it was only after he filed his OIG complaint that MTC provided its alternate explanation of purported

excessive absenteeism. Yet, MTC has not provided a shred of evidence regarding how it handled the alleged excessive absenteeism of those other employees similarly situated to Dr. Shea. This was mere pretext for the real reason for Dr. Shea's termination – Brooks' decision to retaliate against Dr. Shea for his direct communications with Humanitas advisors and, ultimately, with the ROCA inspectors.

### IV. STATEMENT OF CLAIM -- VIOLATION OF 41 U.S.C. § 4712 (a)(1)

26. On January 13, 2017, Dr. Shea was discharged as a reprisal for disclosing the Contract and Policy Requirements Handbook violations and mismanagement of the federal contract to management officials of MTC who were responsible for investigating and addressing misconduct. Specifically, the disclosures made to Brooks on August 1, 2016, September 2, 2016, and November 3, 2016, qualified Dr. Shea for protection from reprisal. Additionally, Dr. Shea's discharge was in reprisal for disclosures made regarding contract violations and contract mismanagement made to the Department of Labor's regional office inspector in the Pre-Assessment Report he authored. These disclosures were reviewed by Brooks, provided to the inspector in December 2016, and the same disclosures were made in-person to the inspector on January 10, 2017 during the inspector's visit to Gary Job Corps Center. Brooks was the individual employee of MTC to which three of the protected disclosures were made and she received a copy of the Pre-Assessment Questionnaire which contained protected disclosures of contract violations and violations of the PRH guidelines. Thus, Brooks knew of the protected disclosures and these protected disclosures occurred within a period of time such that a reasonable person could conclude that the protected disclosures were a contributing factor in her decision to terminate Dr. Shea. This unlawful discharge resulted in financial injury to Dr. Shea in the form of the economic losses he sustained.

## V. Relief Requested

27.     Pursuant to 41 U.S.C. section 4712(c)(1)(B) & (C), Dr. Shea requests compensatory damages, including back pay and front pay, and the aggregate amount of all costs and expenses reasonably incurred in connection with asserting this complaint, including attorneys' fees and expert witness fees, in the following amounts:

28.     Dr. Shea requests back pay at a rate of $60 per hour for a 40-hour work week, beginning on January 13, 2017, up to the date of filing of the complaint. This amount is estimated to be $190,000.00.

29.     Dr. Shea requests reinstatement of his position as Center Dentist at a facility currently being managed under a federal contract by MTC. In lieu of such reinstatement Dr. Shea requests front pay of $60 per hour at a 40-hour work week, beginning from the date of filing until the date of final judgment. Dr. Shea is unable to calculate this amount with certainty at this time. However, assuming a one-year period between date of filing and date of judgment, Dr. Shea estimates forward pay to be roughly $115,200.00.

30.     Due to the unlawful conduct of MTC Dr. Shea has experienced a decrease in attractiveness to other employers in the future leading to further loss in time and level of experience. Dr. Shea requests lost future earnings suffered in the form of a lifetime of diminished earnings resulting from reputational harm suffered as a direct and proximate result of MTC's wrongful termination

31.     As a direct consequence of Dr. Shea's unlawful termination, he was forced to withdrawal funds from his retirement IRA account prior to actual retirement. The penalty associated with these early withdrawals is $33,835.73. In withdrawing funds to cover reasonable and necessary living expenses since his wrongful termination, Dr. Shea was unable to realize

growth increases in his IRA account of $61,174.28 and lost out on contributions to his IRA in the amount of $20,835.62.

32. Dr. Shea has incurred out-of-pocket medical expenses which would have been covered by his health insurance provided by MTC as a benefit but for MTC's wrongful conduct. These out-of-pocket medical costs are roughly $14,700.00.

33. Dr. Shea is unable at this initial stage of litigation to calculate the amount of attorneys' fees that will be incurred in prosecuting Dr. Shea's claim.  However, to date, Dr. Shea has expended roughly $10,000.00 in attorneys' fees in connection with asserting his administrative claim with the Department of Labor's Office of Inspector General. He will continue to incur attorneys' fees up to and including date of judgment in connection with this lawsuit.  Dr. Shea further requests attorneys' fees and costs in the event of appeal to the Circuit Courts of the United States and the Supreme Court of the United States.

## VI. CONDITIONS PRECEDENT

34. Each condition precedent to Dr. Shea's recovery herein has been performed or has occurred.

## VII. CONSOLIDATED ALLEGATIONS

35. Each of Dr. Shea's allegations is expressly incorporated into each of the claims set forth herein.

## VIII. REQUEST FOR JURY TRIAL

36. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands trial by jury in this cause.

## IX. CONCLUSION AND PRAYER

For these reasons, Dr. Shea respectfully requests this Court, upon final trial on the merits, to render judgment in favor of him and against MTC and award him the damages set forth in this First Amended Complaint and all other relief, whether general or special, at law or in equity, to which he may be entitled.

Signed this 8th day of May 2019.                Respectfully submitted,

**KING LAW GROUP PLLC**

*/s/ J. Brandon Barnes*
Richard C. King Jr.
Texas Bar No. 24007491
J. Brandon Barnes
Texas Bar No. 24097341
1326 West Highway 290, Suite A
Dripping Springs, Texas 78620
Tel: 512.263.8212
Fax: 512.900.2918
rking@kinglitigationgroup.com
bbarnes@kinglitigationgroup.com
Attorneys for Plaintiff Graham Shea, DDS

### CERTIFICATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: 1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; 2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; 3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and 4) the complaint otherwise complies with the requirements of Rule 11.

*/s/ J. Brandon Barnes*

## **CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the foregoing *First Amended Complaint* was served on all opposing counsels of record via email and the electronic filing manager on the 8th day of May 2019 as follows:

OBERTI SULLIVAN LLP
Ed Sullivan
712 Main Street, Suite 900
Houston, Texas 77002
713.401.3557 (P)
713.401.3547 (F)

ed@osattorneys.com

                */s/ J. Brandon Barnes*

## CERTIFICATE OF CONFERENCE

Undersigned counsel hereby certifies that on the 7th day of May 2019 undersigned counsel for Plaintiff and defense counsel Ed Sullivan conducted a conference by e-mail wherein they agreed that the Agreed Scheduling Order on file with the Court allowed for amendment to pleadings outside the 21-day requirement of Rule 15 of the Federal Rules of Civil Procedure. Nonetheless, defense counsel consented to the filing of the foregoing *First Amended Complaint*.

／s/ J. Brandon Barnes